**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

CAMBRIDGE VALLEY MACHINING, INC.,

                                Plaintiff,

      v.

HUDSON MFG LLC, et al.,

                          Defendants.

No. 1:18-CV-1022
(CFH)

─────────────────────────────────

**APPEARANCES:**

Boies, Schiller & Flexner LLP          ADAM R. SHAW, ESQ.
30 South Pearl Street, 11th Floor      JOHN F. DEW, ESQ.
Albany, New York 12207
Attorneys for Plaintiff

Grable Martin Fulton PLLC              JACK K. REID, ESQ
4361 South Congress Ave
Suite 110
Austin, Texas 78745
Attorney for Defendants

**MEMORANDUM, DECISION & ORDER**

Plaintiff Cambridge Valley Machining, Inc. ("CVMI") brings this diversity action

against defendants Hudson MFG LLC ("Hudson"), Billie Cyril Hudson III ("Cy Hudson"),

Lauren Hudson, and Hudson Standard LLC ("Hudson Standard") (collectively, where

appropriate, "defendants") for breach of contract and fraudulent conveyance to recover

unpaid balances for goods manufactured for and delivered to Hudson.  See Dkt. No. 50

("Second Amended Complaint" or "SAC").  Defendants answered and asserted

counterclaims for breach of contract.  See Dkt. No. 26.  Presently pending before the

Undersigned[1] are: (1) CVMI's motion for summary judgment on its (a) breach of contract and (b) fraudulent conveyance claims, see Dkt. No. 69; (2) defendants' motion for summary judgment on their counterclaims for breach of contract, see Dkt. No. 70; and (3) CVMI's opposition and cross motion for summary judgment to dismiss defendants' counterclaims.  See Dkt. No. 74.  Defendants oppose CVMI's motion for summary judgment.  See Dkt. No. 75.  Each party has filed a reply to the respective oppositions in response to motions for summary judgment.  See Dkt. Nos. 76, 77.  For the reasons that follow, (1) CVMI's motion for summary judgment is granted in its entirety; (2) defendants' cross motion for summary judgment is denied in its entirety; and (3) plaintiff's cross motion for summary judgment is granted in part and denied in part.

## I. Background

### A. Undisputed Facts

#### 1. The Parties' Contract

CVMI is a New York corporation that performs machining and manufacturing services for the production of component parts for, among other things, firearms.  See Dkt. No. 50 at 1.  Defendant Hudson was a Texas Limited Liability Company ("LLC") that manufactured and sold firearms.  See id.[2]  Defendants Cy Hudson and his wife, Lauren Hudson, were the sole members and managers of defendant Hudson Standard,

---

[1]  The parties consented to the jurisdiction of a Magistrate Judge for all proceedings in this action.  See Dkt. No. 42.

[2]  As discussed in further detail below, Hudson filed Bankruptcy in March 2019, and is no longer in business.

which was the sole owner of Hudson and non-party Skunk Laboratories LLC ("Skunk Labs").  See Dkt. No. 69-2 at 7.

### a. February 2016 Email Exchange

In February 2016, Cy Hudson emailed James Moore ("Moore"), president of CVMI, to begin discussions regarding CVMI's production of component parts for a handgun, the Hudson H9.  See Dkt. No. 70-3 at 3.  On February 15, 2016, Cy Hudson asked Moore for his "thoughts on [CVMI]'s ability to handle the 10,000/month rate of production" and indicated that Hudson was "crunching through [its] cash flow analysis trying to nail down lead times for the steel frame and the slides" and that "[t]he lead times [we]re the stick in the mud for [Hudson]" at that time.  Id.  Moore replied, "[r]egarding the 10,000/month production rate, it is impossible to say for sure without knowing more about the design and reviewing drawings."  Id.  On February 17, 2016, Cy Hudson acknowledged that he "underst[ood that] the design ha[d] to be finalized before [Hudson could] submit a formal RFQ," indicated that he was "attaching pictures of [Hudson's] current [H9] prototypes and a screen picture of the drawings," and asked Moore whether Hudson "could get any guesstimate on lead times based on the drawings or based on frames [CVMI] worked before (1911 or other)"[3] because Hudson was "trying to identify the . . . production numbers and any dependencies for [its] schedule."  Id. at 2.  On February 18, 2016, Moore sent Cy Hudson an email, stating "16 weeks for first production samples is a good guide—this time would be spent designing

---

[3] 1911 refers to a style of handgun and is the basis for the H-9's design.  See Dkt. No. 70-1 at 4 (explaining that the H-9 "pistol design . . . combined the best aspects of the classic model 1911 handgun, with a striker fired design.").

tooling/building tooling/programming/and producing the first article[4] samples.  Once approved, it could take another 4-6 weeks for first production deliveries depending on coating and heat treat requirements.  Regarding quantities, it depends on the design." Id.  Cy Hudson responded, "[t]hanks for the help[, w]e hope to be reaching out with preliminary drawings in the next few weeks."  Id.

### b. Exchange of Forms

On September 21, 2016, Hudson sent CVMI request for quotation ("RFQ") No. RFQ2016-546 ("the September 21, 2016 RFQ") for prices for the production of grips (Part No. H9-200-0001) and slides (Part No. H9-200-003) for the Hudson H9, to be produced according to Hudson's specifications.  See Dkt. No. 26-1 at 2 (Grip: "[f]inish and other specs per print.  Please see marking note below"; Slide: "[f]inish and other spec per prints").  The September 21, 2016 RFQ contained a "REQUIREMENTS" box, which included "[e]stimated [v]olume: [s]ee options below[,] [s]tart of [p]roduction: Nov-16, and [e]nd of [p]roduction: [c]ontinuing."  Id. at 2.  In particular, the September 21, 2016 RFQ stated,

> Please quote each part below in the following volumes:
>
> Option 1: 10,000 piece spot buy, 2500 piece monthly releases.
>
> Option 2: Full production levels.  We expect initial volumes to be in the 30,000 year range, ramping up to 120,000.
>
> Prototypes: Please quote order quantities of 4, 8, and 15, as we have multiple prototype and other requirements in the future.

---

[4] An "article" is the "first gun to be built using the production manufacturing method."  Dkt. No. 70-8 at 6 ¶ 5.

> Please reference any deviations from the prints requested
> under comments.
>
> We are pending a marking variance so would prefer parts
> not be marked immediately to see if we can have this.

Id. at 2.  Moreover, the September 21, 2016 RFQ stated, "Terms and Conditions can be referenced at hudsonmfgllc.com."  Id. at 2.

On October 18, 2016, CVMI sent Hudson a price quote (Quote Q61280), which referenced RFQ2016-546, and provided unit prices and "[e]xtended" prices for Grip REV[5] C. (No. H9-200-001), Frame Insert Rev J. (No. H9-200-002), Slide Rev K. No. H9-200-003), Recoil Spring Guide Rev. B. (No. H9-200-0021), and the cost of fixtures, programming, and engineering for each part.  See Dkt. No. 50-1 at 2-3.  CVMI's October 18, 2016 price quote stated that "all quantities quoted are monthly," and provided monthly unit and extended price quotes based on the monthly production of 500 units per month; 1,000 units per month; 2,500 units per month; and the single-non-recurring engineering cost ("NRE") for each of the quoted items.  See id.  In particular, CVMI provided the following price quotes:

| Item | Quantity | Unit Price | Extended Price |
|---|---|---|---|
| GRIP REV C (H9-200-0001) | 500 | $147.95 | $73,975.00 |
| | 1,000 | $144.21 | $144,210.00 |
| | 2,500 | $141.96 | $354,900.00 |
| | 1 NRE | $93,250.00 | $93,250.00 |
| FRAME INSERT REV J (H9-200-0002) | 500 | $80.08 | $40,040.00 |
| | 1,000 | $76.37 | $76,370.00 |

---

[5] "REV" indicates that Hudson revised the design for the referenced part; the letter following "REV" designates the number of the revision for that part.  See Dkt. No. 74-1 at 8-9.  For instance, when Hudson placed an order for "GRIP REV C," it was placing a request for CVMI to manufacture and ship grips configured with the specifications for Hudson's third revised grip design.  See id.

|  | 2,500 | $74.14 | $185,350.00 |
|---|---|---|---|
|  | 1 NRE | $21,750.00 | $21,750.00 |
| SLIDE REV K (H9-200-0003) | 500 | $127.10 | $63,550.00 |
|  | 1,000 | $123.36 | $123,360.00 |
|  | 2,500 | $121.11 | $302,775.00 |
|  | 1 NRE | $48,000.00 | $48,000.00 |
| RECOIL SPRING GUIDE REV B (H9-200-0021) | 500 | $8.99 | $4,495.00 |
|  | 1,000 | $6.54 | $6,540.00 |
|  | 2,500 | $5.23 | $13,075.00 |

The total price quoted by CVMI in response to Hudson's September 21, 2016 RFQ (RFQ2016-546) was $1,551,640.00.  See id. at 3.  Further, CVMI's October 18, 2016 price quote stated that "CVM[I's] Terms & Conditions (D106) Apply http://www.cvmusa.com/terms/d106.pdf."  Id.  Of particular relevance here, CVMI's Terms & Conditions state, "[t]his quotation is an offer by CVMI and becomes a binding contract on the terms set forth herein when accepted in writing or upon shipment of customer furnished material for the work described herein."  Dkt. No. 50-2 at 2.

In November 2016, Hudson sent CVMI Purchase Order ("PO") No. 2016516 ("the November 2016 PO").  See Dkt. No. 50-3.  The November 2016 PO contained an "order date" of November 4, 2016, for 10,000 grips (Rev. C) at a unit price of $120.00; 10,000 9mm barrels (Rev. F) at a unit price of $33.00; and 10,000 strikers (Rev. C) at a unit price of $15.75, for a total of $1,687,500.00.  Id. at 2 (capitalization omitted).  The "[d]elivery [t]erms" stated "FOB: Original," and "[r]equired [d]elivery" stated "[p]er schedule in notes."  Id.  Under the caption "purchase order comments," the PO stated "[p]arts to be released in 2,500 piece monthly quantities starting 2/1/2017."  Id.

(capitalization omitted).  Lauren Hudson prepared and signed the PO, which is dated November 8, 2016.  See id.

On December 6, 7, and 13, 2016, CVMI sent Hudson Sales Order Acknowledgement Forms for 10,000 grips (Rev. C) at a unit price of $120.00; 10,000 9mm barrels (Rev. F) at a unit price of $33.00; and 10,000 strikers (Rev. C) at a unit price of $15.75, "to be released in 2,500 monthly quantities starting 2/1/17," for a combined total of $1,687,500.00.  Dkt. Nos. 1-4 at 2,3,4; 50-4 at 2, 3, 4.

**2. The May 10, 2018 Conveyances**

In 2015, Cy's father (Lauren's father-in-law), Billie Hudson, Jr., advanced $6,750,000.00 to Standard.  See Dkt. No. 69-15 at 2.  On May 10, 2018, Cy and Lauren Hudson, Standard, Hudson, Sunk Labs, and Billie Hudson, Jr., signed a Debt Restructuring and Redemption Agreement, pursuant to which Standard issued Billie Hudson Jr. a $9,736,240.92 promissory note "as consideration for the Redemption and Restructure"—the buy-back of Billie Hudson, Jr.'s shares in Standard.  See id. at 2, 7, 8; see also Dkt. No. 69-16 (Secured Promissory Note).  Cy Hudson signed on behalf of Standard, as well as Hudson and Skunk Labs, which were listed as pledgors under the agreement.  See Dkt. No. 69-15 at 7.  Cy and Lauren Hudson signed the agreement as guarantors.  See id. at 7, 8; see also Dkt. No. 69-19 at 2-6 (Guarantee Agreement signed by Cy and Lauren Hudson as guarantors and Billie Hudson, Jr. as beneficiary).  Also, on May 10, 2018, Cy Hudson signed a Pledge and Purchase Money Security Agreement on behalf of Hudson and Skunk labs, which pledged all of Hudson's and Skunk Lab's assets and listed Billie Hudson, Jr. as the secured party.  See Dkt. No. 69-

7

17 at 2, 8; see also Dkt. No. 69-20 at 2-4 (UCC Financing Statement pledging Hudson's and Skunk Lab's assets to Billie Hudson, Jr.).  As relevant here, the Pledge and Purchase Money Security Agreement stated that "the [p]ledgors agreed to grant [Billie Hudson, Jr.] a security interest in their assets" "to induce [him] to accept the [promissory n]ote in consideration for the [r]edeemed [i]nterests."  Dkt. No. 69-17 at 2.  In addition, Cy and Lauren Hudson signed a Written Consent of Managers in Lieu of a Meeting of the Board of Managers on May 10, 2018, to approve the two agreements on behalf of Standard, Hudson, and Skunk Labs.  See Dkt. No. 69-18 at 2-4, 8-10, 15-17.

## B. Procedural History

In August 2018, CVMI commenced the present action against Hudson alleging breach of contract and seeking damages under the New York Uniform Commercial Code ("N.Y. U.C.C.") based on Hudson's failure to pay for parts manufactured by CVMI and accepted by Hudson.  See Dkt. No. 1 at 5-8.  In September 2018, CVMI amended the complaint and added Cy and Lauren Hudson as defendants.  See Dkt. No. 6.  In both the original and amended complaint, plaintiff asserted that its October 18, 2016, price quote constituted the "offer" and stated that CVMI's "Terms & Conditions (D106) Applied" and, therefore, governed the parties' agreement.  Dkt. No. 1 at 3; Dkt. No. 6 at 3; Dkt. No. 6-2 at 2-3 (copy of CVMI's Terms & Conditions (D106)); Dkt. No. 1-1 at 2-3 (October 18, 2016, price quote); 6-1 at 2-3 (same); Dkt. No. 50-1 at 2-3 (same).

Defendants moved to dismiss for lack of personal jurisdiction and improper venue, see Dkt. No. 9, which District Court Judge David N. Hurd denied.  See Dkt. No. 25.  Thereafter, defendants filed an answer to the amended complaint in which they

raised various affirmative defenses.  See Dkt. No. 26 at 1-9.  With respect to which parties' terms and conditions applied, defendants admitted that the phrase "Terms & Conditions (D106) Apply" was printed on the forms transmitted by CVMI but argued that they lacked sufficient notice of the terms and conditions because the web address provided on the form was nonfunctional.  See id. at 2; see also Dkt. No. 26-3 (screen shot of 404 error message, stating "[t]he requested URL /terms/d106.pdf was not found on this server.").  Defendants also asserted counterclaims for breach of contract alleging that CVMI's failure to (1) meet monthly time and quantity requirements as contemplated in the November 2016 PO and December 2016 Sales Order Acknowledgement Forms; (2) communicate regarding production schedules; and (3) produce goods that conformed to defendants' specifications, including shipping defective items, breached the parties' agreement and entitled defendants to "monetary relief under [N.Y. U.C.C.] § 2-714 in the form of compensatory damages" and incidental and consequential damages under N.Y. U.C.C. § 2-715.  Id. at 13.  CVMI filed an answer to defendants' counterclaim in which it raised various affirmative defenses.  See Dkt. No. 27.  CVMI, on stipulation of the parties, see Dkt. Nos. 47, 48, filed a Second Amended Complaint ("SAC").  See Dkt. No. 50.  The SAC reasserted the cause of action for breach of contract and damages under the N.Y. U.C.C. contained plaintiff's prior complaints; added Standard as a defendant; added factual allegations and a cause of action for fraudulent conveyance based on the May 10, 2018 transfers; and added a fifth cause of action alleging that the Court should pierce the corporate veil and hold Cy and Lauren Hudson personally liable for Hudson's debts.  See id. at 6-9 (breach of contract and UCC damages), 9-10 (piercing corporate veil), 10 (fraudulent conveyance).

CVMI also reasserted that its terms and conditions (D106) governed the parties' agreement.  See id. at 3.

## II. The Parties' Present Motions

### A.  CVMI's Motion for Summary Judgment

CVMI states that "[t]he parties entered a contract [sic] for the sale of goods on November 4, 2016."  Dkt. No. 69-1 at 2 ¶ 9.  CVMI acknowledges Hudson's November 2016 PO requested "$1,687,500[.00] in items, including 10,000 grips[;] 10,000 slides[;] and 10,000 strikers."  Id.  at ¶ 10.  Further, CVMI states that "the parts were to be released in 2,500 piece monthly quantities starting on February 1, 2017."  Id. at ¶ 11. CVMI posits that, "[f]or the period of December 2016 to December 2017, [CVMI] and Hudson conducted ordinary business under the contract, with CVMI shipping goods and Hudson accepting goods and remitting payment as it was owed."  Id. at ¶ 13.

### 1. Breach of Contract

CVMI first argues that Hudson breached the contract by failing to pay for goods, which Hudson accepted, did not return or reject, and ultimately attempted to sell.  See Dkt. No. 69-1 at 7-8 at ¶¶ 23-27.  In support of this contention, CVMI has submitted: 28 invoices for unpaid grips between April 2, 2018, and June 22, 2018; 22 invoices for unpaid barrels between April 5, 2018, and July 24, 2018; one unpaid invoice for broaches on July 31, 2018; three unpaid invoices for threaded barrels between May 31, 2018, and July 23, 2018; 16 unpaid invoices for strikers between April 18, 2018, and June 28, 2018; and one invoice for unpaid slides from April 30, 2018, for a total amount

in unpaid invoices of $426,593.87.  See Dkt. Nos. 69-1 at 3-7 ¶¶ 17-22; 69-2 at 23.

CVMI contends that it is entitled to damages for this amount pursuant to New York

Uniform Commercial Code ("UCC") § 2-709(1)(a).  See Dkt. No. 69-2 at 23.


### 2. Fraudulent Transfer

CVMI next argues that, in May 2018, prior to Hudson filing for bankruptcy, Lauren

and Cy Hudson caused Hudson and Standard to engage in a fraudulent transfer of

Hudson's asserts to their father, Billie Hudson, Jr., at a time when Hudson was

delinquent on contractual payments and when it knew that it was insolvent.  See Dkt.

No. 69-2 at 14.  Plaintiff asserts causes of action for actual and constructive fraud

pursuant to New York State Debtor and Creditor Law §§ 275 and 276.  See id. at 15.


### a. Actual Fraud

CVMI argues that Cy and Lauren Hudson committed an actual fraudulent transfer

as defined under N.Y. Debt & Cred. Law § 726 in that they "acted with the actual intent

to hinder and delay creditors including CVMI" by entering into the Debt Restructuring

and Redemption Agreement and Pledge and Purchase Money Security Agreement.

Dkt. No. 69-2 at 15.  CVMI contends that "badges of fraud" exist to support its argument

that defendants acted with fraudulent intent in executing the May 18, 2018

conveyances.  See id.  In particular, plaintiff notes the close familial relationship

between Cy and Lauren and Billie Hudson, Jr.  See id.  Further, CVMI argues that

Hudson did not receive adequate consideration for transferring its assets to Standard,

as it received nothing in exchange for its pledge of all of its assets to Billie Hudson, Jr.,

and avers that Hudson executed the conveyance at a time when it was insolvent, as evidenced by the fact that the agreement to transfer its assets was made when it was delinquent on payments to its creditors, including CVMI.  See id. at 16.  In this regard, CVMI also argues that it made no economic sense for Hudson to engage transfer all of its assets at a time when it was insolvent, unable to pay creditors, and on the brink of filing bankruptcy.  See id. at 17.  Moreover, CVMI argues that Hudson continued to maintain control of the assets after the May 18, 2018 conveyance "because the conveyance was a pledge and Hudson . . . continued using the assets in its insolvent . . . business."  Id. at 16-17.  In addition, CVMI states that Hudson, Billie Hudson, Jr., Standard, and Cy and Lauren all used the same law firm to complete the transaction.  See id. at 17.

### b. Constructive Fraud

CVMI also avers that defendants engaged in constructive fraud under New York Debtor and Creditor Law §§ 273, 274, and 275.  See Dkt. No. 69-2 at 17.  In particular, CVMI argues that Hudson was legally insolvent at the time pledged all of its assets to Billie Hudson, Jr. pursuant to the Pledge and Purchase Money Security Agreement.  See id.  Further, CVMI reasserts that the Hudson did not receive adequate consideration in return for the pledge of all of its assets.  See id. at 18.  CVMI points to Hudson's March 2019 bankruptcy petition, which listed assets of $4,253,89.85, liabilities of $11,650,709.55, including $10,061,094.03 worth of secured debts that were only months old.  See id.; see Dkt. No. 69-22 at 2.

12

### 3. Piercing the Corporate Veil

Finally, CVMI contends that the Court should pierce the corporate veil and find Cy and Lauren personally liable for Hudson's debt to CVMI because they dominated all of the companies and caused them to commit fraudulent conveyances to avoid Hudson's obligations under the contract.  See Dkt. No. 69-2 at 19.  CVMI contends that, as part of the Guarantee Agreement, Cy and Lauren "acknowledge[ed] and warrant[ed] that [g]urantors derived or expect[ed] to derive financial and other advantage and benefit, directly or indirectly, from the issuance of the [promissory n]ote to the Redemption and Restructure, in an amount not less than the amount guaranteed . . . ." Id. at 20-21 (quoting Dkt. No. 69-19 at 3).  Moreover, CVMI argues that Cy and Lauren Hudson did not treat Standard, Hudson, or Skunk Labs at arms-length, including providing funds between the companies without any documentation.  See id. at 21.  In addition, CVMI notes that, "[d]espite the intercompany transfers, Hudson . . . did not list . . . Standard as a creditor in its bankruptcy petition," but did list Billie Hudson, Jr. as a secured creditor—who filed a claim in the bankruptcy case for over $10 million.  Id. CVMI posits that Cy and Lauren Hudson "personally caused every transaction to take place, and signed every document related to the transactions on behalf of every Hudson entity" and used Hudson to commit fraud by shifting money between the various LLCs to cause Hudson to become judgment proof from claims by plaintiff by depleting it of all of its assets pursuant to the Pledge and Purchase Money Security Agreement.  See id. at 22-23.

### B.  Defendants' Opposition to CVMI's Motion for Summary Judgment

Defendants' first contend that Hudson did not breach the parties' contract because CVMI committed a prior material breach by failing to timely deliver goods in the agreed upon quantities under the contract and repudiated the contract by failing to provide adequate assurances, thereby excusing Hudson's performance prior to Hudson failing to pay invoices.  See Dkt. No. 75 at 2-13.[6]  Defendants oppose CVMI's fraudulent conveyance cause of action, arguing that, because "CVMI's breach of contract claim fails," CVMI is not considered a creditor under New York law and, therefore, "CVMI has no standing to seek to invalidate any Hudson . . . transactions."  Id. at 14.  Defendants also argue that CVMI made misstatements concerning Hudson's bankruptcy.  See id. In particular, defendants argue that CVMI's statement that the bankruptcy trustee recommended that Hudson's bankruptcy petition be dismissed with no discharge is inaccurate because Hudson filed for bankruptcy under Chapter 7 and "there is never a discharge in a corporate Chapter 7 bankruptcy."  Id.  (citing 11 U.S.C. § 727). Defendants also contend that CVMI incorrectly states that the bankruptcy trustee recommended that Hudson's bankruptcy petition be dismissed; rather, defendants state, the trustee "certified that the estate had been fully administered."  Id. (internal quotation marks and citation omitted).  Moreover, concerning Hudson's bankruptcy, defendants posit that "neither CVMI, nor any of the other creditors who attended the creditors' meetings, objected to the closing of Hudson['s] bankruptcy or requested standing to initiate an adversary proceeding in the bankruptcy court for preferential or fraudulent

---

[6]  Insofar as defendants oppose CVMI's motion for summary judgment concerning plaintiff's breach of contract claim, defendants' advance the same arguments and cite the same evidence in support of their opposition as contained in their motion for summary judgment on their counterclaim.  See Dkt. No. 75 at 2-13; see generally Dkt. No. Dkt. No. 70-8 (Defendants' memorandum of law in support of summary judgment on counterclaim).  Accordingly, because defendants' arguments in this regard are set forth in detail below, the Court will not recite them twice.

transfer.  And it is too late to do so now."  Id.  at 15.  Finally, defendants oppose CVMI's argument that the Court should pierce the corporate veil and hold Cy and Lauren Hudson personally liable for Hudson's debts.  See id.  In this regard, defendants argue that, pursuant to the internal affairs doctrine, Hudson is subject to Texas Business Organizations Code Section 21.223, which bars alter ego claims.  See id.

### C.  Defendants' Motion for Summary Judgment on the Counterclaims for Breach of Contract

Defendants state that "[t]he agreement between [Hudson and CVMI], while not reduced to an executed, written contract, was reached in late 2016, via the acceptance of [Hudson's November 2016 PO] by CVMI."  Dkt. No. 70-8 at 2, 6 ¶ 4.  Further, defendants contend that "[p]roduction of the H-9 parts began in earnest in June 2017," and that "CVMI failed immediately and consistently to live up to its obligations."  Id.  In particular, defendants argues that CVMI breached the contract, thereby excusing their performance, by: (1) failing to timely deliver the contracted-for component parts; (2) failing to meet production milestones; (3) failing to communicate in a commercially reasonable manner; (4) holding needed parts "hostage to force Hudson to pay for unneeded parts"; (5) failing to produce contracted-for component parts to specifications; and (6) producing "dangerously defective barrels" and refusing to remedy the defect.  Id. at 2.

### 1. Detrimental Reliance

Defendants first posit that, in contemplation of CVMI's work under the contract, "[o]n November 28, 2016, Hudson paid $41,466.15 to [nonparty] Trenton Forging

Company for custom tooling required by CVMI."  Dkt. No. 70-8 at 6 ¶ 5.  In addition, Hudson states that, prior to CVMI commencing work on the H-9 project, "Hudson paid CVMI $70,766.54 in expense reimbursements and tooling fees before ever receiving its first article[.]"  Id.  Defendants argue that they paid these monies in "detrimental reliance of [Hudson's] agreement with CVMI."  Id.

### 2. Failure to Timely Produce and Ship Parts

Further, Hudson argues that CVMI's failure to timely produce and ship parts in balanced shipments prevented Hudson from producing H-9s at the pace necessary to sell completed handguns, thereby significantly disrupting Hudson's cash flow and ultimately causing Hudson to file bankruptcy.  See Dkt. No. 70-8 at 1, 2.  In support of their contention that CVMI immediately failed to perform under the contract, defendants rely on the pre-contract February 2016 email exchange between Cy Hudson and Moore. See Dkt. No. 70-3 at 7 ¶ 7.  Defendants posit that the February 2016 email exchange committed CVMI to producing the "its first article within 16 weeks of the [November 2016] purchase order," which "would have been on or around March 8, 2017," and that CVMI failed to perform on this obligation because "CVMI did not deliver the parts necessary to assemble Hudson's first article gun until July 27, 2017."  Id. at ¶ 8.

Defendants also submit numerous emails in support of their contention that CVMI experienced production delays from the beginning, which Hudson attempted to work with CVMI to resolve.  For example, an internal CVMI email from January 23, 2017, indicates that Hudson "expect[ed] conforming product parts for the remaining 9 pcs on the 15 total they need for 6/30/17 testing.  I did not comment on this being doable or

not" and that "[Hudson] would like to know if [CVMI] can ship a completed barrel on

Saturday (tomorrow) . . .," to which CVMI personnel stated "I responded no initially to

this."  Dkt. No. 70-7 at 3.  Another June 23, 2017, internal CVMI email stated that he

"just had a very painful phone call with . . . Hudson.  They are requiring up to the hour

updates from here out."  Id.  Further, a June 30, 2017 email from Cy Hudson to CVMI

stated that the "[c]urrent run time [for barrels] is too long to meet release schedule. . . .

Need to know if barrels can be run all shifts next week"; "[c]ommunication currently sub-

optimal.  I didn't receive the CVM[I] updates today that I requested from program

managers."  Id. at 15-16.  A September 6, 2017 email from Lauren Hudson to CVMI

stated,

> "The release schedule date 8/5/17 shows us receiving 300
> by the beginning of the last week of Sept.  It sounds like
> we're still on track to make that, but I'm concerned about the
> needs beyond that[.]  That release schedule was worst case
> scenario based on getting a critical component re-sourced[.]
> We will be sending an updated release schedule this Friday
> that accounts for some added capacity.  As a projection for
> that, release we will be looking for weekly shipments totaling
> 1100 in October."

Dkt. No. 70-5 at 66.  A July 5, 2017 email from CVMI to Cy Hudson acknowledged that

barrel production was "a day later then requested" and stated that it was "working to

improve."  Dkt. No. 70-3 at 14.  Moreover, a series of September 2017 emails from

Lauren Hudson to personnel at CVMI shows that CVMI was not yet in "full production"

for barrels as of September 14, 2017, which CVMI noted in reply to Lauren Hudson's

email in which she expressed that she was "officially stressed out on the lack of update

and response to request for release acknowledgement" by CVMI.  Dkt. No. 70-5 at 58-

59.

### 3. Failure to Deliver Balanced Shipments

Defendants contend that CVMI breached the contract by failing to deliver parts in balanced shipments, which prevented Hudson from being able to assemble and sell completed H-9s, which negatively affected its cash flow; caused it to lose out on revenue and prevented it from making payments to CVMI; and ultimately led to its bankruptcy.  See Dkt. No. 70-8 at 1, 2, 8-9.  In support of this argument, defendants state that CVMI's first two shipments consisted of 123 barrels, which were received in June 2017.[7]  On July 19, 2017, Hudson received 7 strikers from CVMI, at which point, Hudson "still could not build a single gun."  Id. at ¶ 8.  Defendants posit that it was not until July 27, 2017, that "Hudson . . . received 5 strikers, at which point it could build 5 guns," but that it was responsible for making payments on all parts received up to that date.  Id.  Unbalanced shipments from CVMI continued, defendants argue, which limited Hudson to the production of only 11 H-9s for sale between June 29, 2017, to September 7, 2017.  See id. at ¶ 9.  Defendants assert, that "[a]s of October 1, 2017, Hudson ha[d] paid CVMI $138,944.09, and had received parts enabling Hudson to sell 35 guns."  Id. at ¶ 10.  Further, defendants explain that the wholesale value of a single H-9 was $799.96, see id.; therefore, defendants contend, "through October 1, 2017, in over three months of production, CVMI had provided parts sufficient to generate just $27,298.60 in revenue, whereas, if CVMI had supplied 2,500 of each part per month, Hudson would have been able to realize $5,849,700.00 in revenue.  Id.  Defendants calculate the

---

[7]  Defendants appear to have mistakenly reversed the dates of the receipt of CVMI's first two shipments of barrels in their memorandum of law in support of summary judgment.  See Dkt. No. 70-8 at 7 ("CVMI's first shipment to Hudson was 18 barrels, received by Hudson on June 29, 2017.  CVMI's next shipment was 105 barrels, received by Hudson on June 13, 2017.").  However, it is undisputed that Hudson received 105 barrels as of June 29, 2017.

alleged lost profits by multiplying 10,000 by the whole sale value of a single H-9 of $799.96.  See id. at n.41.

Defendants also submit evidence indicating that the parties modified the quantities required to be produced and delivered under the contract in August 2017, because CVMI was unable to meet the release of 2,500 parts per month of each part as contemplated in the contract.  For example, a September 6, 2017 email from Lauren Hudson to CVMI personnel inquired about the delay in the shipment of strikers, stating

> [t]he release schedule date 8/5/17 show [Hudson] receiving 300 by the beginning of the last week of Sept.  It sounds like we're still on track to make that, but I'm concerned about the needs beyond that[.]  That release schedule was worst case scenario based on getting a critical component re-sourced[.]  We will be sending an updated release schedule this Friday that accounts for some added capacity.  As a projection for that, release we will be looking for weekly shipments totaling 1100 in October.

Dkt. No. 70-5 at 66 (emphasis added).  In response, CVMI personnel indicated to Lauren Hudson that

> the latest update from 8/31 indicated parts would be going to HT today, 9/6, we did have a 1.5-2 day delay for a mechanical issue on Friday/yesterday unfortunately but this has been resolved and parts are now running again.  We are still on track to get the 300+ to you for last week of Sept and the 1100/month should be able to be met with current operators capacity.  Do you expect the 1100/month to continue for the full 10k order quantity?

Id. (emphasis added).  Further, emails from Lauren Hudson to Moore in late 2017, indicate that the 300/week production pace was contemplated through early 2018.  See Dkt. No. 70-3 at 72 (October 29, 2017 email from Lauren Hudson to Moore, stating "[a]ttached is the current release schedule by component (the business week that components leave your facility) . . . basically working to 300/wk for the next 12 weeks

with the intent to ramp up."); Dkt. No. 70-5 at 70 (November 17, 2017, email from Lauren Hudson to Moore, stating "We need to know that the pipeline is being filled to support shipping parts in even quantities no more than 300/week at this time and ready to ramp w/ the slides that CVM is able to bring online []FAI planned week of 2/12/2018[]."); Dkt. No. 70-3 at 25 (December 21, 2017 email from Lauren Hudson to CVMI, containing weekly production schedule of 300 parts per week).

### 4. Repudiation

Defendants next contend that their performance under the contract was excused because CVMI repudiated the contract by (1) failing to provide adequate assurances of performance, (2) failing to communicate in a commercially reasonable manner, and (3) focusing on other projects while misleading defendants.  See Dkt. No. 70-8 at 9-15.  In support of these contentions, defendants submitted numerous emails from Lauren Hudson inquiring about production schedules and indicating Hudson's concerns with CVMI's delays and communication, including a September 11, 2017, email from Lauren Hudson to CVMI in which she attached an updated release schedule and asked personnel at CVMI, "**[w]hat else, at this point, is CVM[I] missing from Hudson that will allow us to hit our targets?**"  Dkt. No. 70-5 at 59.  Defendants posit that "[t]his email was clearly . . . a request for CVMI to commit to a level of production[] or[] explain why it could not do so and propose what it could do."  Dkt. No. 70-8 at 11.  Lauren Hudson sent a follow-up email on September 13, 2017, stating "I'm officially stressing out on the lack of update and response to request for release acknowledgement.  Are we on track?  Please let me know ASAP," and "[c]an you please send an update on all

parts.  Haven't seen a confirmation on the intended barrel release schedule."  Dkt. Nos. 70-5 at 44; 70-7 at 5.  Lauren also sent a follow-up email on September 14, 2017, in which she stated "[t]hanks for the update.  Are you confident we can hit our release schedule?"  Dkt. No. 70-5 at 58.

CVMI responded on September 14, 2017, stating that it "apologize[d] for the delay" and that it had "135 completed barrels at quality, 5 for FAI" and "an additional 225 at final turn," along with "5 prototype threaded barrels, shooting to be machined by next Friday"; CVMI also indicated to Lauren Hudson that it was "compiling [its] notes" regarding strikers to try to "create a clear direction."  Dkt. No. 70-5 at 58.  Defendants contend that CVMI's "failure to respond to th[e] question" of whether it was confident it could hit the proposed release schedule constituted a "failure to respond to Hudson's request for adequate assurances" and constituted "a repudiation of the contract under [N.Y. U.C.C. §] 2-609," which "excused [Hudson] from its obligation to pay CVMI[] pursuant to [N.Y. U.C.C. §] 2-610(c)."  Dkt. No. 70-8 at 12.

Defendants also submit an internal CVMI email from September 19, 2017, in which CVMI personnel stated, "I am uncomfortable sending Hudson confirmation of the order/forecast with the lack of focus on the barrel.  For over a month I have been requesting that Brian work on the cycle time with no results, because SpaceX or GD is more important."  Dkt. No. 70-7 at 5.  On September 25, 2017, CVMI sent Hudson a production update and forecast for production, which stated that CVMI's "weekly capacity" for grips was at "279 grips" per week "though we have yet to reach this level of output.  This is my largest concern.  There is much room for improvement, more machines, more hours, shorter programs.  This must be addressed"; barrel production

21

capacity was "around 300 units/week"; and striker production capacity was "750+ per week if machine is dedicated to Hudson strikers." Dkt. No. 70-3 at 20. CVMI also noted that the following shipments of components were possible: for grips, "9/29, qty 100Week of 10/2, qty 250Week of 10/9, qty 250Week of 10/16, qty 360"; for strikers, CVM has only sent FAI samples. Qty 500 on hand at CVM. Hudson will need 164 shipped to bring inventory to match grips, then follow grip schedule"; and for barrels, "Hudson has 105 on hand CVM has 268 projected ready for shipment 9/26. Hudson will need 59 shipped to bring inventory to match grips, then follow grip schedule." Id. at 21. However, an October 5, 2017 email from Lauren Hudson to CVMI personnel indicated that "all parts are currently behind the submitted release schedule dated 9/11/17. As of the start of this week, each part was behind by: [g]rips: 748[; b]arrel: 657[; s]triker: 300." Dkt. No. 70-5 at 35. Lauren Hudson emphasized that Hudson "d[id] not want . . . the strikers or barrels to be ramped up unless their release [wa]s synchronized with the grip" and that "[s]ynchronized parts release [was] crucial for cash flow," [e]ven though all parts are behind, [Hudson] ha[s] to have them in similar cumulative quantities to build complete guns and keep money coming in. [Hudson has] no use for 500 strikers this week if [it] only ha[s] 89 grips." Id. She also requested that CVMI provide "daily updates re[garding] production and shipments." Id. Lauren Hudson reiterated the need for synchronized shipping again in December 2017 when she sent CVMI an updated production schedule, requesting that parts be shipped "in the same quantity" at 300 parts per week. Dkt. No. 70-3 at 25.

Defendants also submit email correspondence from January 2018, in which Lauren Hudson again made repeated requests concerning CVMI's "suspected schedule

slip" for slides, which she indicated was "extremely concerning for planning purposes" and "cash flow problems," to which CVMI replied "[p]rogress is being made on all fronts but we still have work to do on building fixtures, programming, manufacturing/obtaining the required gauging, etc.  The original first article due date was 2/16.  The current projection for the first article is 3/7."  Dkt. No. 70-3 at 73, 74.  However, in February 2018, Moore indicated internally that he had "talked to Hudson and was able to push FAI out to the week of 3/5, but they were kicking and screaming.  I blamed the 3 tools that are late (for angled hole).  Let's work together to figure out how to make this happen asap," to which CVMI personnel replied that his "current projection for Hudson slides 5 piece FA completion [wa]s 3/23."  Dkt. No. 70-7 at 57.  Moreover, defendants point to internal CVMI emails in which CVMI's tooling and methods manager, Ray VaGuilder ("VanGuilder") stated, among other things, that the Hudson "project is a monster" and that "[i]t is no secret that [CVMI] has communication issues," which defendants contend constitutes an admission of poor communication with Hudson by CVMI.  Dkt. No. 70-7 at 22; see Dkt. No. 70-8 at 15 ¶ 24.

### 5. Production of Defective Grips

Next, defendants argue that CVMI's production of 896 defective grips caused magazines to fall out of guns, which resulted in damage to Hudson's reputation and caused Hudson direct economic harm in the amount of $39,447.55 that consisted of "money actually spent by Hudson as a result of the grip defects—not including lost revenues/profits from delays, etc."  See Dkt. No. 70-8 at 15.  In support of this contention, defendants produce numerous emails indicating that, beginning in early

March 2018, Hudson informed CVMI that customers were reporting that magazines were falling out of the grips when firing or racking the slide forward and that Hudson had "determined that the cause of the problem [wa]s with one of the dimension[s] on the grip."  Dkt. No. 70-7 at 25.  CVMI responded on March 9, 2018, and acknowledged that it had "found [that] the issue [wa]s in [CVMI's] tooling and . . . inspection method[, which] did not enable the operator to inspect the full depth of this feature," and notifying Hudson that "all parts [CVMI] ha[d] in house ha[d] th[e] issue" and that "[t]he 200 pieces [CVMI] had planned to ship today will not be going and will be reworked on Monday with plans to ship by Tuesday."  Id. at 26.  Further, CVMI noted that "[s]ince this was found, we have modified our [inspection procedures] to check this to full depth.  I am also in the process of designing a functional gage that will inspect along with the trigger dimensions we had an issue with."  Id.

### 6. Production of Defective Barrels

Defendants also argue that CVMI's production of "catastrophically defective barrels" caused Hudson "direct economic damages."  Dkt. No. 70-8 at 16.  Defendants posit that CVMI's production of defective barrels constituted a breach of the contract that entitles them to damages under N.Y. U.C.C. § 2-714(1), including incidental and consequential damages under N.Y. U.C.C. § 2-715.  See id. at 18.  Defendants submit email correspondence indicating that several H-9 barrels "bl[ew] up during testing."  Dkt. No. 70-7 at 28.  Internal email correspondence at CVMI in late April 2018, stated that "[a]ll products should be quarantined asap," CVMI needed to "re-inspect everything," and that "[w]hoever is inspecting this feature should be re-trained."  Id.  Upon

inspection, CVMI "found samples that d[id] no[t] conform to the surface finish callout on the print" and noted that "[s]ome of them look quite ghastly."  Id.  Moore indicated to CVMI's barrel production team members that "it [wa]s absolutely unacceptable and embarrassing for CVM[I] to ship product in this condition.  How are we monitoring this? I would like to see the data."  Id.  CVMI personnel communicated to Hudson in early May 2018, stating "[p]lease return the 250 pcs we talked about over the phone on RA00638.  Also, please return any of the remaining suspect barrels (139 and 198 pc Lots) for inspection/rework if needed at CVMI on the same RA#."  Dkt. No. 70-3 at 31. In addition, defendants provide a July 2018 email correspondence from Hudson to CVMI indicating that Hudson would be returning 77 barrels for various defects, including "chatter/tool marks" and improper dimensions.  Dkt. No. 70-7 at 49.  Hudson informed CVMI that the 77 barrels being returned included 75 warranty returns and "[two] that were received with no rifling.  The Corrective action that you took after the last round of [testing] failed."  Id.  In total, defendants aver that "Hudson was forced to return 585 barrels," which resulted in damages of $54,452.26."  Dkt. No. 70-8 at 18 ¶ 31.

### 7. Breach of Pay to Ship Agreement

Finally, defendants contend that, due to CVMI's inability to meet production goals or provide balanced shipments, Hudson was unable to generate sufficient revenue and fell behind on its debt to CVMI.  See Dkt. No. 70-8 at ¶ 33.  "Between January 4, 2018[,] and May 17, 2018, Hudson paid CVMI $598,634.62 in attempts to pay down the outstanding invoices."  Id. at 19 ¶ 34.  Thereafter, defendants posit, the parties agreed that they would operate on a pay to ship basis, meaning that CVMI would ship product

on receipt of payment by Hudson.  See id. at ¶ 35.  According to defendants, CVMI and

Hudson operated under the pay to ship agreement between June 8, and June 22, 2018;

however, defendants contend that some of these shipments included defective parts

that had to be returned to CVMI.  See id.  Defendants state that, "when defective parts

were returned to CVMI, they were credited against the oldest invoice, not against the

shipping credit."  Id.  Defendants proffer an internal CVMI email in support of this

contention which states, "assuming we agree parts are indeed faulty the logical thing to

do is to apply them to the oldest open invoices against their account.  NOT to use them

as a credit balance we can ship against (which is what I think [Hudson] is referring to)."

Dkt. No. 70-7 at 53 (internal quotation marks omitted).  Further, defendants contend that

because of CVMI's decision to credit the returns to Hudson's oldest invoices instead of

the shipping credit, Hudson ran out of money to pay CVMI by August 2018, and CVMI

refused to ship any further product and "abandoned Hudson and shifted its attention to

working on Hudson's competitor's products."  Dkt. No. 70-8 at 19 ¶ 36.  Defendants

argue that the foregoing entitles them to damages pursuant to N.Y. U.C.C. §§ 2-714

and 2-715.  See id.


### D. CVMI's Opposition to Defendants' Motion for Summary Judgment and Cross Motion for Summary Judgment to Dismiss Defendants' Counterclaims

CVMI oppose defendants' motion for summary judgment and cross-moves for

summary judgment dismissing defendants' counterclaim.  See Dkt. No. 74.  CVMI first

avers that defendants' brief in support of summary judgment on its counterclaim is a

"[h]odgepodge of statements without citation to a single case and should fail on that

ground alone."  Dkt. No. 74-1 at 10 (citing N.D.N.Y.L.R 7.1).  CVMI contends that,

insofar as defendants claim that they detrimentally relied on CVMI, such claim must fail "because there is no independent cause of action for detrimental reliance and there can be no other equity-based claim because a contract governs the parties' relationship." Id. at 10-11.  Second, CVMI argues that defendants' breach of contract claim based on untimely delivery, imbalanced shipments, and inadequate quantities "fails as a matter of law because time was not of the essence and the parties modified the schedule."  Id. at 11.  In particular, CVMI avers that the statement "[p]arts to be released in 2500 piece monthly quantities starting 2/1/2017" was a "comment that Hudson added to its purchase order," and "reference[d] a desired start date for performance" but "does not clearly and unequivocally demand that time be of the essence."  Id. at 12.  CVMI also contends that Hudson's reliance on the March 8, 2017 delivery date is flawed, arguing that "Hudson . . . derived that date from an email that CVMI sent in February 2016, 8 months before the purchase order, which referred to an estimated delivery schedule for samples, not final products, and suggested that there could be an even longer time frame."  Id.  In addition, CVMI argues that, insofar as "Hudson purported to add a contractual term for a date of performance into its purchase order, it was legally ineffective" because CVMI's Terms and Conditions governed the parties' agreement and expressly provided that "[a]ll agreements are contingent upon . . . other delays unavoidable and beyond CVMI control," which made any proposed date of performance a mere forecast.  Id.  CVMI also contends that its Terms and Conditions precluded Hudson from adding contractual terms that were inconsistent with CVMI's terms.  See id.

Third, CVMI contends that the parties' agreement did not contain a provision requiring balanced shipments of prescribed quantities.  See Dkt. No. 74-1 at 14.  CVMI notes that defendants' argument in this regard relies on the phrase regarding the release of 2,500 parts per month starting February 1, 2017, which they posit pertains to CVMI's price quote; however, CVMI argues that this is erroneous because "CVMI's initial sales quote, which served as the offer to this contract, contained no such language."  Id.  In any event, CVMI argues, "even if the statement were considered a term of the parties' contract, the term was modified and waived through the parties' performance and by subsequent agreements."  Id. at 15.  In particular, CVMI argues that Hudson's acceptance of later deliveries in differing quantities waved any provision regarding delivery dates and amounts.  See id. at 17.  Moreover, CVMI argues, Hudson modified delivery dates, parts designs, and amounts over the course of the parties' relationship.  See id.  CVMI observes that Hudson's November 17, 2017 email expressly stated that Hudson "needed to know that the pipeline is being filled to support shipping parts in even quantities no more than 300/week at this time . . . ."  Id. at 18 (quoting Dkt. No. 70-5 at 70).  Moreover, CVMI points out that in June 2018, as Hudson states in support of its counterclaim, the parties modified the terms of the delivery dates and amounts to a "pay to ship basis."  Id.

Fourth, CVMI contends that defendants' repudiation claim fails.  See Dkt. No. 74-1 at 19.  CVMI argues that it responded to Hudson's various email requests regarding shipments and quantities and attempted to ensure Hudson that CVMI intended to perform and provide the goods requested as scheduled; therefore, CVMI urges, its responses cannot be considered repudiation or lack of assurance.  See id. at 19, 22.

28

Further, CVMI avers that "Hudson's emails cannot be considered demands for adequate assurances because they do not clearly state that Hudson will not perform absent the assurances." Id. at 21-22.  Moreover, CVMI argues, defendants were not entitled to demand assurances regarding balanced shipments of certain quantities because neither was required under the contract.  See id. at 22.  In any event, CVMI argues, defendants failed to pursue the proper remedies for repudiation under N.Y. U.C.C. § 2-610, as defendants "continued to perform, continued to insist on performances from CVMI, and accepted performances from CVMI." Id.  at 23.

Fifth, CVMI avers that defendants' counterclaim for damages due to defective grips and barrels fails.  See Dkt. No. 74-1 at 24.  CVMI notes that defendants cite no caselaw and rely exclusively on N.Y. U.C.C. §§ 2-714 and 2-715 in support of this contention.  See id.  Further, CVMI argues that defendants have failed to identify any valid damages for these claims.  See id.  CVMI contends that, once Hudson returned the nonconforming parts to CVMI, CVMI credited Hudson the cost of the returned parts, which it took off of Hudson's outstanding balance.  See id.  In particular, CVMI cites a June 19, 2019 email from Carla Weaver at Hudson to CVMI asking, "Can you apply it to the oldest invoice?" in reply to an email from personnel at CVMI stating, "Thank you for the 50k wire we just received.  There were no notes . . . I don't know what invoices to apply it to." Dkt. No. 74-17 at 2.  CVMI argues that this email belies defendants' contention that Hudson was unaware that the returns would be credited to its oldest invoices, rather than its shipping balance.  See Dkt. No. 74-1 at 24.  Moreover, CVMI argues that defendants are not entitled to consequential damages because they have not "submitted evidence that shows any subsequent malfunction of a completed gun

was directly traceable to a non-conforming part and not the fault of some other problem." Id. at 25.  Alternatively, CVMI argues that defendants' claim for damages based on the allegedly non-conforming parts fails because "CVMI's terms and conditions explicitly limit potential damages to exclude any expenses incurred by other parties in connection to repair or replacement of its goods." Id. at 26.  CVMI contends that defendants cannot recover damages based on allegedly lost profits and argues that defendants' claims in this regard are speculative and do not satisfy the strict standard for proving such damages required for a new business.  See id.  CVMI also notes that at the time Hudson filed bankruptcy, it was over $11 million in debt.  See id.  Finally, CVMI argues that defendants fail to state a claim for breach of contact based on CVMI's refusal to deliver goods when Hudson stopped paying pursuant to the pay to ship agreement the parties reached in June 2018, because, contrary to defendants' contention in this regard, CVMI properly stopped shipping product to Hudson in August 2018 when Hudson communicated that it was no longer able to pay.  See id.

### E. CVMI's Reply to Defendants' Opposition

CVMI contends that defendants do not dispute that they received goods from CVMI for which they failed to pay, offer no contradictory evidence, and cited no case law in support of their contention that they were excused from payment.  See Dkt. No. 76 at 4.  CVMI argues that, for the reasons set forth in its cross motion, see Dkt. No. 74, defendants failed to establish that CVMI breached the contract and, even assuming it did, defendants' refusal to pay for goods that Hudson accepted was not a valid remedy under N.Y. U.C.C. §§ 2-607 or 2-714.  See id. at 5-9.  Further, CVMI contends that

defendants are incorrect in arguing that CVMI lacks standing to bring a claim for fraudulent conveyance on the basis that CVMI does not have a valid breach of contract claim.  See id. at 9.  CVMI also contends that defendants misconstrue its argument regarding Hudson's bankruptcy petition, and state that it cited Hudson's bankruptcy petition to demonstrate that, at the time of the May 10, 2018 conveyances, Hudson was insolvent and undercapitalized.  See id.  Finally, CVMI argues that defendants' reliance on Texas Business Organizations Code § 21.223 for the proposition that Cy and Lauren Hudson cannot be held personally liable for Hudson's debts is misplaced because, under subsection (b), "individual owners of a corporation may still be held liable when an obligee can prove that the corporation was used to perpetrate an actual fraud for the direct benefit of the owners."  Id. at 11.  CVMI contends that the documentary evidence establishes that Cy and Lauren Hudson admitted to personally benefiting from the conveyances and that CVMI has established actual fraud based on the pledge of all of Hudson's assets to Billie Hudson, Jr.  See id.

**F. Defendants' Reply**

In reply to CVMI's motions, defendants reassert that the parties' agreement required that 2,500 of each part be delivered to Hudson each month and "include[d] an understanding that one of each part [wa]s needed to make each Hudson H-9."  Dkt. No. 77 at 2.  Defendants also contend that CVMI's argument that the parties' agreement did not contain a time is of the essence term is unpersuasive because a time is of the essence term applies only to real estate contracts and not to contracts for the sale of goods between merchants.  See id.  Further, defendants contend that CVMI is incorrect

in asserting that the parties' agreement did not require CVMI to make balanced shipments and argue that, pursuant to N.Y U.C.C. 2-209(1), when CVMI "confirmed" the phrase "Parts to be released   in   2,500   piece   monthly   quantities   starting   2/1/17," "it became part of the contract."   Id. at 3 (internal quotation marks omitted).   Finally, defendants appear to argue that the parties' course of performance did not modify the contract, such that Hudson's acceptance of the "trickle of parts" from CVMI did not waive the requirement to make timely and balanced monthly deliveries of 2,500 of each part.   See id. at 3-4.

### III. Discussion

### A. Legal Standard

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).   "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists."   Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)).   Facts are material if they may affect the outcome of the case as determined by substantive law.   See Anderson, 477 U.S. at 248.   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id.   "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all

reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 272-73. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 of New York, New York & Vicinity, AFL

CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir.2002) (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.1993)).  "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it [and] a district court is not required to grant judgment as a matter of law for one side or the other."  Heublein, 996 F.2d at 1461.

## B. Analysis

### 1. Goods Sold and Delivered

The parties do not dispute that New York law applies to this diversity action as to the contractual dispute.  Because the transaction between the parties involved the sale of goods, it is governed by Article 2 of the U.C.C.  See N.Y. U.C.C. § 2-102; Long Island Lighting Co. v. Imo Indus. Inc., 6 F.3d 876, 887-88 (2d Cir.1993) (observing that, in New York, contracts for the sale of goods are governed by Article 2 of the UCC).

"To recover on a claim for goods sold and delivered, a plaintiff must show that: (1) it had a contract with the buyer; (2) the buyer failed to pay the purchase price; and (3) the buyer accepted the goods."  Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc., 952 F. Supp. 2d 542, 571 (S.D.N.Y. 2013); see also N.Y. U.C.C. § 2-709(1)(a) ("When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price of goods accepted . . . .").  Goods are deemed accepted when a buyer:

> (a) after a reasonable opportunity to inspect the goods
> signifies to the seller that the goods are conforming or that
> he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

N.Y. U.C.C. § 2-606(a)-(c).

Here, the parties do not dispute that Hudson had an agreement with CVMI for the sale of goods.  See Dkt. No. 50 at 5 ¶ 29; Dkt. No. 70-8 at 2, 6 ¶ 4.  Further, CVMI has proffered unpaid invoices for parts that Hudson accepted, but failed to paid, which total $426,593.87.  See Dkt. Nos. 69-1 at 3-7 ¶¶ 17-22; 69-2 at 23.  Defendants do not dispute that Hudson did not pay those invoices or that it did not accept the goods itemized therein, and do not refute CVMI's contention that it attempted to sell those goods to third parties.  See Dkt. No. 75 at 6 ¶ 9; Dkt. No. 77 at 2-4.  Moreover, defendants do not offer any admissible evidence to contradict CVMI's invoices.   Thus, CVMI has established a prima facie claim for goods sold and delivered.  See Kasper Glob. Collection & Brokers, Inc., 952 F. Supp. 2d at 571; N.Y. U.C.C. § 2-709(1)(a). However, it is well settled under New York law that "a buyer may defeat or diminish a seller's substantive action for goods sold and delivered by interposing a valid counterclaim for breach of the underlying sales agreement."  Created Gemstones v. Union Carbide Corp., 47 N.Y.2d 250, 255, 417 N.Y.S.2d 905, 391 N.E.2d 987 (1979). Accordingly, Hudson's acceptance, alone, does not end the Court's inquiry.  See id.

### 2. Defendants' Counterclaims and CVMI's Cross Motion

#### a. Repudiation

In support of their motion for summary judgment on their counterclaim and in opposition to CVMI's motion and cross motion, defendants do not dispute that Hudson failed to pay the aforementioned invoices; however, defendants argue that CVMI repudiated the contract by failing to provide Hudson with adequate assurances.  See Dkt. No. 70-8 at 9-15.  N.Y. U.C.C. § 2-609 provides parties to a contract for the sale of goods with a right to adequate assurances of performance.  Section 2-609 provides:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.  When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
>
> (3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
>
> (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

N.Y. U.C.C. § 2-609(1)-(4).  Pursuant to N.Y. U.C.C. § 2-610(c), "[w]hen a party repudiates a contract with respect to performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may: . . . suspend his own performance . . . ."

Here, Lauren Hudson's September 2017 emails in which she asked CVMI it needed anything further from Hudson to allow it to hit production targets and whether

CVMI was confident that it would be able to meet release schedules cannot properly be considered demands to provide assurance of performance, as the emails "make no reference to [N.Y.] U.C.C.[ and] do[] not track the language of [N.Y.] U.C.C. § 2-609(1)." In re Beeche Sys. Corp., 164 B.R. 12, 17 (N.D.N.Y. 1994). In addition, the emails do not contain any "clear demand for assurance so that all parties are aware that, absent assurances, the demanding party will withhold performance." BonWorth, Inc. v. Runway 7 Fashions, Inc., No. 17-CV-9712 (PAE), 2019 WL 3202930, at *11 (S.D.N.Y. July 16, 2019) (internal quotation marks, brackets, and citation omitted).

"The determination whether the assurance given was adequate is a factual question dependent on the circumstances of the case." Nat'l Fuel Gas Distribution Corp. v. TGX Corp., No. 84-CV-1372E, 1992 WL 170819, at *6 (W.D.N.Y. July 10, 1992). However, in this case, regardless of the adequacy of CVMI's responses, CVMI correctly avers that defendants did not elect to cancel the contract or stop its performance—rather, it continued to perform under the contract for nearly a year after the alleged September 2017 failure to provide assurances and gave no notice to CVMI that it was withholding its right to cancel the contract on that basis. See Dkt. No. 74-1 at 22-23; see Nat'l Fuel Gas Distribution Corp., 1992 WL 170819, at *9 (citing official comment no. 4 to N.Y. U.C.C. § 2-610, which states that, "[a]fter repudiation, the aggrieved party. . . is left free to proceed at any time with his options under this section, unless he has taken some positive action which in good faith requires notification to the other party before the remedy is pursued," and concluding that continuation of performance under the contract constitutes positive action requiring notification (emphasis added)). Indeed, following CVMI's alleged failure to provide assurances,

Hudson continued to order products from CVMI and pay for them, and even ordered slides from CVMI—an additional component part that was not originally contracted for. See Dkt. No. 74-1 at 23; Dkt. No. 70-2 at 4 ¶ 19 (Cy Hudson declaration stating, "[o]n November 14, 2017[,] Hudson sent a purchase order for 2000 slides."); Dkt. No. 70-5 at 68 (Hudson's first purchase order for 2,000 slides at $132.00/slide). Thus, Hudson's repudiation claim fails as a matter of law based on its continued performance under the contract following the alleged repudiation without providing notification that it was reserving its right to cancel the contract on that basis. See, e.g., Nat'l Fuel Gas Distribution Corp., 1992 WL 170819, at *10 (holding that, where the plaintiff did not cancel the contract or notify the defendant that it was reserving its right to do so following the defendant's failure to provide adequate assurances and continued to perform under the contract, the plaintiff was not entitled to terminate the contract on that basis nearly a year after a court decision finding that the plaintiff was entitled to adequate assurances and three years since it made its initial demand for such assurances). Consequently, defendants' counterclaim insofar as it is premised on repudiation is denied, CVMI's cross motion to dismiss this claim is granted, and the claim is dismissed with prejudice.

### b. Breach of Contract

A "[p]laintiff must prove four elements to make out a valid claim for breach of contract under New York law: '[1] formation of a contract, [2] performance by the plaintiff, [3] breach and [4] 'resulting damage.'" Genger v. Genger, 663 F. App'x 44, 48

(2d Cir. 2016) (summary order) (quoting <u>McCormick v. Favreau</u>, 82 A.D.3d 1537, 1541, 919 N.Y.S.2d 572 (2011) (internal quotation marks and citation omitted)).

As a general matter, "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . ."  N.Y. U.C.C. § 2-201(1).  However, the exchange of forms may be sufficient to create a contract pursuant to N.Y. U.C.C. § 2-207.  Under section 2-207,

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

N.Y. U.C.C. § 2-207(1).  Where, as here, the exchange of form occurs between merchants, additional terms "become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."  <u>Id.</u> at § 2-207(2)(a)-(c).

Here, defendants state that, "[t]he agreement between [Hudson and CVMI], while not reduced to an executed, written contract, was reached in late 2016, via the acceptance of [Hudson's November 2016 PO] by CVMI."  Dkt. No. 70-8 at 2, 6 ¶ 4.  In its memorandum of law in support of summary judgment, CVMI states that, "[t]he parties entered a contract [sic] for the sale of goods on November 4, 2016."  <u>See</u> Dkt. No. 69-1 at 2 ¶ 9.  CVMI also states that the parties' contract was formed pursuant to N.Y. U.C.C. § 2-204.  <u>See</u> Dkt. No. 74-1 at 11.  CVMI argues that its October 2016 price quote

(Quote Q61280) was a "offer" that was subject to CVMI's "Terms and Conditions, which specified that a purchase order responding to the quote was an acceptance [and] that different or additional terms in any such purchase order would not be integrated into the contract[.]"  Dkt. No. 74-1 at 8; see Dkt. No. 50-2 at 2.  CVMI avers that its terms and conditions, as referenced on the October 2016 price quote, made clear "that a purchase order responding to the quote was an acceptance, that different or additional terms in any such purchase order would not be integrated into the contract, that all agreements were contingent upon unexpected delays, and that CVMI was not liable for any costs or expenses incurred by others relating to repair or replacement of the work described in the quote."  Dkt. No. 74-1 at 8.  CVMI contends, Hudson's November 2016 PO constituted an acceptance and that any different or additional terms contained therein would be excluded from the contract.  See id.  The Court disagrees.

Subsection 10 of CVMI's Terms & Conditions states, "[t]his quotation is an offer by CVMI and becomes a binding contract on the terms set forth herein when accepted in writing or upon shipment of customer furnished material for the work described herein."  Dkt. No. 50-2 at 2.  Although not raised by the parties, it is clear from the evidence before the Court that neither of the two conditions required for making CVMI's October 2016 price quote a binding contract on the terms set forth [there]in" occurred—that is, the October 2016 price quote was not "accepted in writing" and did Hudson did not "ship[] customer furnished material for the work described" in the price quote.  Id.  Rather, as discussed above, Hudson sent its November 2016 PO—which contained different terms as to price per unit and total price than stated in CVMI's October 2016

40

price quote and contained the phrase "[p]arts to be released in 2,500 piece monthly quantities starting 2/1/17." Dkt. No. 50-3.

In December 2016, CVMI responded to Hudson's November 2016 PO with its three separate Sales Order Confirmation Forms—which included terms that matched Hudson's November 2016 PO as to (1) price per unit for 10,000 grips (Rev. C), 9mm barrels (Rev. F), and strikers (Rev. C); (2) total price of $1,687,500.00, and (3) which contained the phrase "to be released in 2,500 monthly quantities starting 2/1/2017." Dkt. No. 50-3 at 2; Dkt. No. 50-4 at 2, 3, 4. Thus, the Court concludes that Hudson's November 2016 PO constituted an offer, which CVMI accepted via its December 2016 Sales Order Acknowledgement Forms, and that the parties reached an agreement for CVMI to manufacture and deliver 10,000 of each of the aforementioned parts at a rate of 2,500 pieces per month at the prices contained in the November 2016 PO and December 2016 Sales Order Acknowledgement Forms. See, e.g., CBS, Inc. v. Auburn Plastics, Inc., 67 A.D.2d 811, 812, 413 N.Y.S.2d 50, 51 (1979) (holding that, because the plaintiff did not respond to the defendant's price quotation until months after the time allotted for had passed, "the purchase orders submitted by [the] plaintiff did not create enforceable contracts since they had no binding effect upon [the] defendant"; rather, the "plaintiff's purchase orders constituted offers . . ., and [the] defendant's acknowledgements of those orders," "which described the [items], the price and the terms of payment and delivery essentially as contained in the purchase orders," "represented [the defendant's] acceptance of the offers."). Thus, a contract was created based on the exchange of forms pursuant to N.Y. U.C.C § 2-207, not section 2-204. However, the parties have advanced no arguments under section 2-207. Therefore, to

the extent that CVMI, in support of either its motion or cross motion, contends that any of the issues involved are resolved pursuant to their terms and conditions, issues of fact exist precluding summary judgment on that basis.

### i. Timeliness, Sufficiency, and Balance of Shipments

Defendants, relying exclusively on N.Y. U.C.C. § 2-714, argue that CVMI breached the contract by failing to timely deliver balanced shipments or sufficient quantities, thereby entitling defendants to damages for "nonconformity of tender" and excusing their obligation to pay for parts.  Dkt. No. 70-8 at 9 ¶ 12.  As an initial matter, CVMI correctly argues that defendants erroneously rely on the March 8, 2017, date to establish that CVMI breached the contract because, as CVMI contends, defendants extrapolated this date from email communications between Cy Hudson and Moore that occurred early on during pre-contract negotiations in February 2016.  See Dkt. No. 74-1 at 12.  It is clear that the information, including production and release timeline, provided in the February 2016 email exchange amounted only to preliminary estimates as to the potential production schedule based on comparable firearms, did not contemplate the precise specifications for the H-9 component parts, and was never incorporated into the parties' agreement.  Indeed, defendants own evidence, including the internal CVMI email stating that "[t]he original first article due date was 2/16.  The current projection for the first article is 3/7," further establishes that the parties did not have a concrete date for the FAI.  Dkt. No. 70-3 at 73, 74.  Thus, defendants fail to establish that CVMI breached the contract based on the purported March 8, 2017 deadline.

Further, as CVMI argues in opposition and in support of its cross motion for summary judgment, defendants' contention that CVMI breached the contract and excused Hudson's performance by failing to release 2,500 parts per month is erroneous because the admissible evidence establishes that the parties' modified the release rate and payment terms.  Dkt. No. 74-1 at 15, 17.  N.Y. U.C.C. § 2-714(1) allows for a recovery "as damages for any nonconformity of tender[,] the loss resulting in the ordinary course of events from the seller's breach[,] as determined in any manner which is reasonable."  N.Y. U.C.C. § 2-714(1).  Official Comment number 2 to this section explains that "'non-conformity' . . . includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract."  N.Y. U.C.C. § 2–714 (Official Comment No. 2).  "Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel."  CT Chems. (U.S.A.) v. Vinmar Impex, 81 NY2d 174, 179 (N.Y. 1993); see N.Y. U.C.C. §§ 2-208, 2-209.

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

N.Y. U.C.C. § 2-208(1).  "[S]uch course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."  Id. at § 2-208(3).

Here, the evidence before the Court establishes that the parties modified the release schedule to significantly reduce the production and shipment capacities from the 2,500/month release schedule contained in the November 2016 PO and December

43

2016 Sales Order Acknowledgement Forms to 300/week, or 1,100/month.  See Dkt. No. 70-5 at 66 (September 6, 2017 email from CVMI to Lauren Hudson stating, "[w]e are still on track to get the 300+ to you for last week of Sept and the 1100/month should be able to be met with current operators capacity.  Do you expect the 1100/month to continue for the full 10k order quantity?"); Dkt. No. 70-3 at 72 (October 29, 2017 Email Lauren to Moore stating, "[a]ttached is the current release schedule by component (the business week that components leave your facility) . . . basically working to 300/wk for the next 12 weeks with the intent to ramp up."); Dkt. No. 70-5 at 70 (November 17, 2017 Email from Lauren Hudson to Moore stating, We need to know that the pipeline is being filled to support shipping parts in even quantities no more than 300/week at this time and ready to ramp w/ the slides that CVM is able to bring online (FAI planned week of 2/12/2018)." (emphasis added)).  Moreover, it is undisputed that the parties' payment terms were modified throughout the course of their relationship, including eventually to a pay to ship agreement pursuant to which CVMI would release parts to Hudson only upon receipt of payment from Hudson.  See Dkt. No. 70-8 at 18 ¶ 35.

As set forth in detail above, defendants submit able evidence in support of their argument that CVMI experienced production and release delays, and had difficulties providing balanced parts shipments to Hudson despite Hudson repeatedly making CVMI aware that they needed "synchronized" shipments of parts in order to allow Hudson to produce completed H-9s for sale to maintain adequate cash flow.  Dkt. No. 70-5 at 35.  However, faced with repeated occasions to object to the timeliness, quantity, and balance of the shipments, Hudson chose to honor its obligation to pay for the items under the contract, and even worked with CVMI to develop a pay to ship

payment schedule once Hudson fell into financial difficulty.  See CT Chems. (U.S.A.), 81 N.Y.2d at 180 (holding that, based on the defendant's decision to "honor its payment obligation to furnish a letter of credit" despite repeated occasions to object to this method of payment, the parties modified the contract through their course of performance to require payment by letter of credit.).  Indeed, defendants' own evidence establishes that neither party contemplated CVMI manufacturing or shipping 2,500 of each component part per month to Hudson beginning in February 2017; rather, as Lauren Hudson's October 29, 2017 email establishes, Hudson contemplated "working to 300/week" for each component part produced by CVMI, which would have extended until January 2018, "with the intent to ramp up" in 2018.  Dkt. No. 70-3 at 72. Consequently, CVMI has established that defendants' reliance on the 2,500 piece monthly release fails to establish that CVMI breached the contract given the parties' modifications to the release terms.  Accordingly, defendants' motion for summary judgment is denied as to this claim and CVMI's cross motion for summary judgment granted and the claim is dismissed with prejudice.

Moreover, defendants have failed to establish damages based on CVMI's failure to produce balanced shipments.  In support of this argument, defendants rely exclusively on their purported lost revenue, contending that the wholesale value of a single H-9 was $799.96 and that, "through October 1, 2017, in over three months of production, CVMI had provided parts sufficient to generate just $27,298.60 in revenue, whereas, if CVMI had supplied 2,500 of each part per month, Hudson would have been able to realize $5,849,700.00 in revenue.  Dkt. No. 70-8 at ¶ 9 (emphasis added). Defendants calculate the alleged lost profits by multiplying 10,000 (the total number of

each component part ordered in the November 2016 PO) by the wholesale value of an H-9, $799.96.  See id. at n. 41.

"In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty."  Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000).  To establish a claim for lost profits, it is well settled that "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes."  Kenford Co. v. Erie Cty., 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235 (N.Y. 1986).  "Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'"  Schonfeld, 218 F.3d at 172 (quoting Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 1010 (N.Y. 1993)).  "[E]vidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate."  Schonfeld, 218 F.3d at 172 (citing Kenford Co., 67 N.Y.2d at 261).  Consequently, "[p]rojections of future profits based upon "a multitude of assumptions" that require "speculation and conjecture" and few known factors do not provide the requisite certainty.'"  Id. (quoting Kenford Co., 67 N.Y.2d at 261).

Here, the undisputed evidence establishes that neither party contemplated operating at the full capacity of 2,500 parts/month or reaching the total 10,000 quantity contained in the agreement as early as "October 1, 2017"; rather, the evidence demonstrates that the parties were still operating on a 300-parts-per-week release schedule at that time.  Dkt. No. 70-8 at ¶ 9; see Dkt. No. 70-3 at 72.  Therefore,

defendants' purported lost revenues based on the 10,000 parts figure is misplaced. Further, although damages for lost profits "'need not be proven with 'mathematical precision,'" defendants' alleged lost revenue of $5,849,700.00 is not the product of the 10,000-piece figure multiplied by the wholesale price of a single H-9 of $799.96, which would be $7,999,600.00.  Schonfeld, 218 F.3d at 172 (quoting Ashland Mgmt. Inc., 82 N.Y.2d at 403); see Dkt. No. 70-8 at 8 n. 41.  In fact, defendants offer no "'known reliable factors'" or offer any explanation whatsoever as to how they arrived at their number.  Id.  Thus, as defendants' claim for lost revenue is based on pure speculation, defendants' motion for summary judgment in this regard is denied and CVMI's cross motion is granted and this claim is dismissed with prejudice.

### ii. Defective Grips and Barrels

Defendants do not dispute that they failed to pay for the invoices set forth in CVMI's statement of material facts and memorandum of law for parts they accepted, but argue that CVMI manufactured and shipped defective grips and barrels, thereby breaching the parties' agreement and, entitling defendants to money damages pursuant to N.Y. U.C.C. § 2-714 for compensatory damages and pursuant to N.Y. U.C.C. § 2-715 for incidental and consequential damages.  See Dkt. No. 70-8 at 15-16.  CVMI cross moves for summary judgment dismissing this counterclaim on the basis that CVMI did not commit any breach by sending defective products to Hudson because Hudson returned the defective parts to CVMI for repair and replacement and "CVMI immediately credited Hudson the cost of the returned parts, taking them off the balance of Hudson's sizeable outstanding debts."  Dkt. No. 74-1 at 24.  Further, CVMI contends that the

damages defendants characterize as "direct economic loss," are actually consequential damages to which defendants are not entitled "because they have not provided any evidence that such damages were directly traceable to the non-conforming parts and not due to intervening causes." Id. at 24-25. CVMI also argues that defendants have failed to offer "proof of any costs other than an email, written by Cy Hudson, that lists dollar amounts" to support this claim. Dkt. No. 74-1 at 25.

Although not addressed by defendants, CVMI characterizes the parties' agreement as an installment contract. See Dkt. No. 74-1 at 17. N.Y. U.C.C. § 2-612(1) defines an "installment contract" as a contract that contemplates the "delivery of goods in separate lots to be separately accepted." CVMI's characterization of the contract is arguably correct. See N.Y. UC.C. § 2-612 cmt. 1 ("The definition of an installment contract is phrased . . . broadly . . . so as to cover installment deliveries tacitly authorized by the circumstances or by the option of either party."). Under an installment contract, rejection of goods is governed by N.Y. U.C.C. § 2-612(2), which states that a "buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured . . . ." Further, N.Y. U.C.C. § 2-612(3) provides that "whenever non-conformity . . . with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. "Whether a breach constitutes substantial impairment is a question of fact." Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc., 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995) (internal quotation marks and citation omitted).

Here, there is no dispute that Hudson timely and effectively rejected installments of defective grips and barrels, which it returned to CVMI. See Dkt. No. 74-1 at 24-25.

48

Cy Hudson's August 2018 email contains a breakdown of the costs to Hudson allegedly caused by CVMI, includes dollar amounts for warranty time and warranty shipping, warranty grips and barrels, shipping for failed grips and barrels, inspection time for failed grips and barrels, costs associated with reworking grips and barrels, priority shipping and special processing costs for failed barrels, and costs associated with firearms damaged as a result of defective barrels.  See Dkt. No. 70-3 at 28.  Notably, all of these figures relate to the defective grips and barrels, which Hudson rejected and returned to CVMI.  See id.  Further, Cy Hudson's email acknowledges that, as of August 14, 2018, Hudson owed CVMI approximately $371,580.00.  See id. at 29. However, based upon the record before the Court, it is unclear that the unpaid invoices proffered by CVMI, see Dkt. No. 69-1 at 3-7 ¶¶ 17-22, included the defective grips or barrels rejected by Hudson.  See Dkt. No. 70-8 at 15-16; Dkt. No. 70-3 at 28-29. Rather than pointing to specific evidence to support this claim, defendants rely solely on N.Y. U.C.C. § 2-714 which provides that, "[w]here a buyer has accepted goods and given notification" a buyer "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." (emphasis added).  Thus, defendants' argument in this regard is confused.

Nevertheless, CVMI has not offered evidence to establish to establish entitlement to summary judgment as to the alleged damages associated with the defective grips and barrels, as proffered in Cy Hudson's August 2018 email.  Rather, CVMI argues only that Hudson did not sustain damages because CVMI credited the defective parts to Hudson's outstanding balance.  See DKt. No. 74-1 at 24.  However, CVMI does not

argue that such credit accounted for the costs associated with the defective parts as alleged by defendants.  Indeed, CVMI argues in support of its cross motion for summary judgment that Hudson's claim for incidental and/or consequential damages due to the defective grips and barrels pursuant to N.Y. U.C.C. § 2-715 should be dismissed "because [defendants] have not provided any evidence that such damages were directly traceable to the non-conforming parts and not due to intervening causes."  Dkt. No. 74-1 at 24-25.  Defendants, however, have proffered evidence to the contrary.  Concerning the defective grips, defendants have submitted emails indicating that, beginning in early March 2018, Hudson informed CVMI that customers were reporting that magazines were falling out of the grips when firing or racking the slide forward and that Hudson had "determined that the cause of the problem [wa]s with one of the dimension[s] on the grip."  Dkt. No. 70-7 at 25.  CVMI's response on March 9, 2018, acknowledged that it had "found [that] the issue [wa]s in [CVMI's] tooling and . . . inspection method[, which] did not enable the operator to inspect the full depth of this feature," and notifying Hudson that "all parts [CVMI] ha[d] in house ha[d] th[e] issue" and that "[t]he 200 pieces [CVMI] had planned to ship today will not be going and will be reworked on Monday with plans to ship by Tuesday."  Id. at 26.

Similarly, with respect to the defective barrels, defendants have submitted email correspondence indicating that several H-9 barrels "bl[ew] up during testing."  Dkt. No. 70-7 at 28.  Internal email correspondence at CVMI in late April 2018, stated that "[a]ll products should be quarantined asap," CVMI needed to "re-inspect everything," and that "[w]hoever is inspecting this feature should be re-trained."  Id.  Upon inspection, CVMI "found samples that d[id] no[t] conform to the surface finish callout on the print" and

noted that "[s]ome of them look quite ghastly."  Id.  Moore indicated to CVMI's barrel

production team members that "it [wa]s absolutely unacceptable and embarrassing for

CVM[I] to ship product in this condition.  How are we monitoring this?  I would like to

see the data."  Id.  In early May 2018, CVMI personnel communicated to Hudson,

stating "[p]lease return the 250 pcs we talked about over the phone on RA00638.  Also,

please return any of the remaining suspect barrels (139 and 198 pc Lots) for

inspection/rework if needed at CVMI on the same RA#."  Dkt. No. 70-3 at 31.  In

addition, defendants provide July 2018 email correspondence from Hudson to CVMI

indicating that Hudson would be returning 77 barrels for various defects, including

"chatter/tool marks" and improper dimensions.  Dkt. No. 70-7 at 49.  Hudson informed

CVMI that the 77 barrels being returned included 75 warranty returns and "[two] that

were received with no rifling.  The Corrective action that you took after the last round of

[testing] failed."  Id.  Thus, questions of fact exist as to the amount of damages, if any,

defendants are entitled to due to the defective grips and barrels.  Accordingly,

defendants' motion for summary judgment and CVMI's cross motion for summary

judgment in this regard are denied.  See Heublein, 996 F.2d at 1461.


### iii. Defendants' Remaining Arguments

Defendants argue that some of the parts shipped pursuant to the pay to ship

agreement were defective and that CVMI breached the agreement because it chose to

credit the returns of defective parts to Hudson's oldest invoices instead of applying them

to Hudson's shipping credit, which caused Hudson to run out of money to pay CVMI by

August 2018, after which CVMI refused to ship any further product and "abandoned

Hudson and shifted its attention to working on Hudson's competitor's products."  Dkt. No. 70-8 at 19 ¶ 36.   CVMI submits that they justifiably stopped shipping parts to Hudson in August 2018, when Hudson was no longer able to pay and that, once Hudson returned the nonconforming parts to CVMI, CVMI credited Hudson the cost of the returned parts, which it took off of Hudson's outstanding balance.  See Dkt. No. 74-1 at 24.  CVMI avers that an email from Carla Weaver at Hudson belies defendants' contention that it was unaware that the returns would be credited to its oldest invoices, rather than its shipping balance.  See id.  In particular, CVMI cites a June 19, 2019 email from CVMI stating, "Thank you for the 50k wire we just received.  There were no notes . . . I don't know what invoices to apply it to."  Dkt. No. 74-17 at 2.

Defendants submit no evidence that the parties' pay to ship agreement required CVMI to apply the amount of returned goods to a shipping credit instead of to its oldest outstanding invoices.  Defendants' purported evidence in support of this argument—an internal CVMI email which states, "assuming we agree parts are indeed faulty the logical thing to do is to apply them to the oldest open invoices against their account.  NOT to use them as a credit balance we can ship against (which is what I think [Hudson] is referring to)," Dkt. No. 70-7 at 53 (internal quotation marks omitted)—fails to establish that CVMI breached the pay to ship agreement.  At most, this evidence suggests that Hudson implied that it wanted returns applied to a shipping credit rather than against the oldest outstanding invoices, but not that the parties ever reached any such agreement.  Moreover, CVMI's reliance on Carla Weaver's email is unpersuasive, as that email referenced a payment of $50,000.00 from Hudson to CVMI—which had nothing to do returns of defective products. Dkt. No. 74-17 at 2.  Accordingly, as neither

party has submitted evidence establishing that no genuine issue of material fact exists as to this issue, defendants' motion for summary judgment and CVMI's cross motion in this regard are denied.  See Heublein, 996 F.2d at 1461.

As a final matter, defendants contend that they suffered damages under a theory of detrimental reliance because Hudson paid CVMI "$70,766.54 in expense reimbursements and tooling fees before ever receiving its first article" and $41,466.15 to nonparty Trenton Forging Company for "custom tooling required by CVMI[.]"  Dkt. No. 70-8 at 6 ¶ 5.  As CVMI posits, "[d]etrimental reliance is an element of equitable and promissory estoppel; there is no independent cause of action for detrimental reliance." Paxi, LLC v. Shiseido Americas Corp., 636 F. Supp. 2d 275, 286-87 (S.D.N.Y. 2009); see Cyberchron Corp. v. Calladata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir.1995) ("reasonable and foreseeable reliance" is an element of a New York promissory estoppel claim); Dkt. No. 74-1 at 10 ("there is no independent cause of action for detrimental reliance.").  "Promissory estoppel is a legal fiction which is used as consideration for contractual consideration where a party relies, to its detriment, on the promises of another without having entered into an enforceable contract.  It is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."  DDCLAB Ltd. v. E.I. DuPont De Nemours and Co., 03 Civ. 3654, 2005 WL 425495, at *6 (S.D.N.Y. Feb. 18, 2005) (internal citations omitted) (emphasis added).  Here, there is no genuine dispute that a written contract existed, which was enforceable—indeed, both parties assert breach of contract claims which rely on the existence of an enforceable contract.  Accordingly,

defendants' motion in this regard is denied, CVMI's cross motion is granted, and the claim is dismissed with prejudice.

### 3. Fraudulent Transfer

CVMI contends that the May 2018 conveyances are voidable pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276 under theories of intentional fraudulent conveyance and constructive fraudulent conveyance.  See Dkt. No. 69-2 at 15-17.

### a. Actual Fraud

At all times relevant to this case, N.Y. Debt. & Cred. Law § 276 provided that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. LAW § 276.[8]  "Because direct proof of actual intent is rare, a plaintiff may 'rely on so-called "badges of fraud" to prove his case,' which 'are circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"  Long Oil Heat, Inc. v. Spencer, 375 F. Supp. 3d 175, 195 (N.D.N.Y. 2019) (quoting Ray v. Ray, 108 A.D.3d 449, 451 (N.Y. App. Div. 1st Dept. 2013)).

> Courts have recognized the following nonexclusive list of badges of fraud: (1) a close relationship between the parties to the transfer; (2) inadequacy of the consideration; (3) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (4) the transferor's retention of control of the property after the transfer; (5) the fact that the transferred property was the only asset sufficient to pay the

---

[8]  Article 10 of the New York Debtor & Creditor Law was amended effective April 4, 2020.  However, citations to the sections of Article 10 herein refer to the law as it existed at the times relevant to this case prior to the 2020 amendment.

transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor.

Id. (citations omitted).

Here, CVMI cites record evidence to establish a number of the badges of fraud. First, CVMI observes the close familial relationship between Cy and Lauren Hudson, the sole members and managers of Standard, Hudson, and Skunk Labs; and Billie Hudson, Jr., Cy's father and Lauren's father-in-law. See Dkt. No. 69-2 at 15-16. CVMI also points to the documents memorializing the May 10, 2018 conveyances themselves to show that Hudson did not receive any consideration in exchange for pledging all of its assets to Billie Hudson, Jr. See Dkt. No. 69-17 at 2-10 (Pledge and Purchase Money Security Agreement); Dkt. No. 69-20 at 2-4 (UCC Financing Statement pledging Hudson's and Skunk Lab's assets to Billie Hudson, Jr.). Indeed, the Pledge and Purchase Money Security Agreement pursuant to which Hudson pledged all of its assets to Billie Hudson, Jr. states that Hudson and Skunk Labs "agreed to grant [Billie Hudson, Jr.] a security interest in their assets" "to induce [him] to accept the [promissory n]ote in consideration for the [r]edeemed [i]nterests"; the "[r]edeemed [i]nterests" refer to the shares of Standard that Standard redeemed from Billie Hudson, Jr. under the Debt Restructuring and Redemption Agreement in exchange for which he received the $9,736,240.92 promissory note. Dkt. No. 69-17 at 2 (stating that Standard "purchased and redeemed . . . all of [Billie Hudson, Jr.'s i]nterests," which are referred to as "the [r]edeemed [i]nterests."). However, the documents also evidence that Hudson received nothing in exchange for its pledge. See Dkt. Nos. 69-15, 69-17.

Further, CVMI has established that the May 10, 2018 conveyances were executed at a time when Hudson was delinquent on its payments to CVMI.  See Dkt. No. 69-1 at 3-7 ¶¶ 17-22 (setting forth Hudson's unpaid invoices between April 2, 2018, and July 31, 2018).  In fact, it is undisputed that the parties entered into the pay to ship agreement in early June 2018, due to Hudson's inability to pay invoices—shortly after the May 10, 2018 conveyances were executed.  See Dkt. No. 70-8 at ¶ 35.  In addition, as CVMI notes, Hudson filed bankruptcy in March 2019, approximately 10 months after the May 10, 2018 conveyances were executed.  See generally Dkt. No. 69-22 (Hudson's March 28, 2019 bankruptcy petition).  Indeed, Hudson's bankruptcy petition lists its total secured debt as $10,061,094.00—of which Billie Hudson, Jr. was listed as being entitled to $9,736,240.92—and total unsecured debt of $1,589,615.52 of which Hudson listed "unknown" for the amount owed to CVMI.  See Dkt. No. 69-22 at 9,10, 15, 32.  Hudson listed total debts of over $11 million and total assets of $4,253,890.93.  See id. at 9.  Thus, at the time Cy and Lauren Hudson executed the May 10, 2018 conveyances which caused Standard to issue a $9,736,240.92 promissory note and Hudson to pledge all of its assets as an inducement for Billie Hudson, Jr. to accept the promissory note, Hudson was delinquent on payments to creditors, including CVMI; had accumulated significant debts beyond the value of its assets; and was 10 months away from bankruptcy—a scenario in which Hudson's assets would have been the only means by which it could satisfy its outstanding debts.

Moreover, Hudson retained control of its assets following the May 10, 2018 pledge and continued operations until August 2018 when it ran out of money to acquire parts from CVMI under the pay to ship agreement.  See Dkt. No. 70-8 at ¶¶ 33-35.  In

addition, the pledge of all of Hudson's assets in order to induce Billie Hudson, Jr. to accept a promissory note to redeem his interest in Standard when Hudson was on the brink of filing bankruptcy was a "questionable transfer not in the usual course of business" for either company supporting yet another badge of fraud.  Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 248 (N.Y. App. Div. 1st Dpt. 1999). Indeed, it strains logic that pledging an interest in all of Hudson's assets to induce Billie Hudson, Jr. to accept a promissory note issued by Hudson's parent company, Standard, at a time when Hudson was experiencing significant financial difficulty was done for any purpose other than to hinder CVMI's rights as to Hudson's outstanding debts and shield Hudson's assets from future claims.  See N.Y. DEBT. & CRED. LAW § 276; cf. Spencer, 375 F. Supp. 2d at 196 (denying the plaintiff's motion for summary judgment on its claim pursuant to New York Debtor & Creditor Law § 276 where the defendants had "mustered contrary evidence that the asset sale was a legitimate business transaction . . . .").

Defendants do not offer any additional or conflicting evidence in opposition to CVMI's intentional fraudulent conveyance claim and, in fact, do not provide any alternative explanations for the challenged conveyances sufficient to raise a genuine issue of material fact.  See Dkt. No. 75.  Rather, defendants argue that CVMI does not have a valid breach of contract claim and, therefore, CVMI is not considered a creditor under New York law and lacks standing to challenge the May 10, 2018 conveyances. Dkt. No. 75 at 14.  As discussed above, this argument is belied by the Court's conclusion that CVMI does, in fact, have a valid breach of contract claim against defendants pursuant to N.Y. U.C.C. § 2-709(a)(1).  See subsection III.B.1, supra.

Defendants also argue that none of Hudson's creditors challenged the May 10, 2018 conveyances during the bankruptcy proceeding and, therefore, "it is too late to do so now" because such claim is barred by 11 U.S.C. § 546.  See Dkt. No. 75 at 15.  However, section 546 of the bankruptcy code defines the bankruptcy trustee's powers to avoid a transfer—but does not define the rights of unsecured creditors, such as CVMI, to challenge a conveyance under the New York Debtor & Creditor Law.  See 11. U.S.C. § 546.  Moreover, defendants' arguments concerning CVMI's purported mischaracterization of the bankruptcy trustee's disposition is of no moment, as CVMI has made clear in its reply to defendants' opposition that CVMI proffered Hudson's bankruptcy petition as evidence "that Hudson . . . had no assets, was insolvent, and was under-capitalized."  Dkt. No. 76 at 10.

### b. Constructive Fraud

CVMI invokes N.Y. Debtor & Creditor Law §§ 273, 274, and 275 in support of its claim for constructive fraud.  See Dkt, No. 69-2 at 17.

Section 270 of the N.Y. Debtor & Creditor Law defined "conveyance" broadly to include "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property . . . ."  (emphasis added).  "A conveyance is deemed constructively fraudulent pursuant to [N.Y. Debtor & Creditor Law] section 273, if (1) the conveyance was made without fair consideration, and (2) the conveyor was insolvent or was rendered insolvent by the conveyance."  First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc., 871 F. Supp. 2d 103, 120 (E.D.N.Y. 2012); see N.Y. DEBT. & CRED. LAW § 273.  Under New York law, "[a] person is insolvent when

the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. DEBT. & CRED. LAW § 271(1).  "The burden of proving insolvency and lack of fair consideration is generally on the party challenging the conveyance."  Perrone v. Amato, No. 09-CV-316 (AKT), 2017 WL 2881136, at *32 (E.D.N.Y. July 5, 2017) (citations omitted).  "Once it is established that a debtor transferred property without fair consideration, however, the law presumes that the transfer rendered the debtor insolvent."  First Keystone Consultants, Inc., 871 F. Supp. 2d at 120 (citations omitted). "When a transfer is made without consideration, courts have applied a presumption of insolvency that shifts the burden to the defendant to rebut by showing continued solvency after the transaction."  RTC Mortg. Tr. 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192, 199 (S.D.N.Y. 2001); see First Keystone Consultants, Inc., 871 F. Supp. 2d at 120 (granting summary judgment as to the plaintiff's constructive fraudulent conveyance pursuant to section 273 where the court found the contested transaction to have been executed without fair consideration and the defendant failed to overcome the presumption of insolvency); see also Miner v. Edwards, 221 A.D.2d 934, 934 (N.Y. App. Div. 4th Dept. 1995) (granting the plaintiff's motion for summary judgment on its constructive fraudulent conveyance claim pursuant to sections 273 and 275 where the defendant "failed to overcome the presumption of insolvency that arises when a conveyance is made without consideration").  "Defendants may only rebut the presumption by proving continued solvency after the date of the transfer."  Perrone, 2017 WL 2881136, at *32.

A recipient of property gives fair consideration for the property if: (1) the recipient either conveys property or satisfies an antecedent debt in exchange for the property received; (2) the property conveyed or the antecedent debt satisfied is "a fair equivalent" for the property received, and (3) the exchange is "in good faith."  N.Y. DEBT. & CRED. LAW § 272; see Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 53 (2d Cir. 2005).  "To show fair equivalent value, neither mathematical precision nor a penny-for-penny exchange is required."  Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 448 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  A court assessing fair equivalent value must "compare the rough values of what was given and what was received in exchange."  Id. at 449.

New York courts have stressed that the "good faith of both transferor and transferee is . . . an indispensable condition in the definition of fair consideration" under N.Y. Debtor & Creditor Law § 272.  Stout St. Fund I, L.P. v. Halifax Grp., LLC, 148 A.D.3d 744, 748 (N.Y. App. Div. 2d Dept. 2017).  The lack of good faith could be shown by: (1) the lack of "an honest belief in the propriety of the activities in question"; (2) "intent to take unconscionable advantage of others"; and (3) "intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others."  Southern Indus. v. Jeremias, 66 A.D.2d 178, 183 (N.Y. App. Div. 2d Dept. 1978).  Although "an exchange can be in good faith even if it constitutes a preferential repayment of preexisting debts to a transferee-creditor; the transferee knows that the transferor is preferring him over other creditors; and the preferred transferee knows that the transferor was insolvent," a critical exception lies where "the transferee is an officer,

director, or major shareholder of the transferor, i.e., an insider." Spencer, 375 F. Supp. 3d at 197 (internal quotation marks and citations omitted).

Here, the undisputed evidence establishes that Cy and Lauren Hudson caused Standard to issue a promissory note in excess of $9.7 million dollars to Billie Hudson, Jr.—a "major shareholder of" Standard, partly induced by the pledge of all of Hudson's assets. Spencer, 375 F3d at 197; See Dkt. Nos. 69-15, 69-17.  This evidences bad faith. See Spencer, 375 F3d at 197.  Further, Hudson did not receive anything in exchange for the pledge of all of its assets to Billie Hudson, Jr.; thus, a "compar[ison] the rough values of what was given and what was received in exchange" establishes that Hudson did not receive adequate consideration. Chen, 8 F. Supp. 3d at 448; See Dkt. No. 69-17 at 2-8.  Indeed, Billie Hudson, Jr. neither conveyed property to Hudson nor satisfied an antecedent debt in exchange for the pledge of Hudson's assets. See N.Y. Debt. & Cred. Law § 272; Dkt. No. 69-15.  Thus, CVMI has established that the Pledge and Purchase Money Security Agreement lacked fair consideration; accordingly, the burden shifts to defendants to demonstrate that it remained solvent following that transaction. See RTC Mortg. Tr. 1995-S/N1, 171 F. Supp. 2d at 199; First Keystone Consultants, Inc., 871 F. Supp. 2d at 120; Miner, 634 N.Y.S.2d at 307.  Defendants, however, have failed to proffer any evidence or advance any specific arguments concerning Hudson's solvency before or after the May 10, 2018 conveyances in opposition to CVMI's constructive fraudulent conveyance claim. See Dkt. No. 75 at 14-15.  Consequently, CVMI's motion, insofar as it seeks summary judgment on its constructive fraudulent conveyance claim, is granted.

### 4. Piercing the Corporate Veil; Alter Ego Liability

The parties disagree on which state's "alter ego" doctrine should apply to this dispute.  Defendants contend that Texas Business Organization Code section 21.223 applies, which provides that an owner of a corporation "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory."  TEX. BUS. ORG. CODE. § 21.223(a)(2)[9]; See Dkt. No. 75 at 16. Defendants also point out that an exception applies, which states "[s]ubsection (a)(2) does not prevent or limit the liability of a . . . beneficial owner . . . if the obligee demonstrates that the . . . beneficial owner, . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . beneficial owner . . . ."  Id. at § 21.223(b). CVMI, in reply to defendants' opposition, contends that, even if this issue were to be decided under Texas law, Cy and Lauren Hudson's conduct would fall into the exception under section 21.223(b) because actual fraud has been established and the "Guarantee Agreement . . . plainly states that [Cy] and Lauren Hudson are the [g]uarantors, and that the '[g]uarantors acknowledge and warrant that [g]uarantors derived or expect to derive financial and other advantage and benefit, directly or indirectly, from the issuance of the [promissory n]ote pursuant to the Redemption and

---

[9]  Section 21.223 applies to limited liability companies.  See Tex. Bus. Org. Code § 101.002(a) ("Subject to Section 101.114, Section[] 21.223 . . . appl[ies] to a limited liability company and the company's members, owners, assignees, affiliates, and subscribers.").

Restructure, in an amount not less than the amount guaranteed [there]under."  Dkt. No. 76 at 11 (quoting Dkt. No. 69-19 at 3).

"New York choice of law rules require a court to apply the law of the state with the most significant relationship with the particular issue in conflict."  LiquidX Inc. v. Brooklawn Capital, LLC, 254 F. Supp. 3d 609, 616 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).  "When determining whether to pierce the corporate veil the court must apply the law of the state of incorporation of the defendant."  Wuhan Airlines v. Air Alaska, Inc., No. 97-CV-8924 (RO), 1999 WL 223493, at *1 (S.D.N.Y. Apr. 14, 1999); see Soviet Pan Am Travel Effort v. Travel Comm., Inc., 756 F. Supp. 126, 131 (S.D.N.Y. 1991) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.").

Texas law permits piercing the corporate veil to "prevent fraud or to achieve equity."  Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd., 99 F.3d 746, 752 (5th Cir. 1996).  Pursuant to Tex. Bus. Org. Code. § 21.223(b), "[s]ubsection (a)(2) does not prevent or limit the liability of a . . . beneficial owner . . . if the obligee demonstrates that the . . . beneficial owner, . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . beneficial owner . . . ."  "[E]stablishing that a transfer is fraudulent under the actual fraud prong of [Texas Uniform Fraudulent Transfer Act] is sufficient to satisfy the actual fraud requirement of veil-piercing because a transfer that is made 'with the actual intent to hinder, delay, or defraud any creditor,' Tex. Bus. & Com. Code Ann. § 24.005(a)(1), necessarily involves dishonesty of purpose

or intent to deceive."  Matter of Ritz, 832 F.3d 560, 567 (5th Cir. 2016) (additional

internal quotation marks and citation omitted).  Similar to case law considering actual

fraudulent conveyance under New York Debtor & Creditor Law § 276, as contained in

New York's Uniform Voidable Transactions Act, the Texas Uniform Fraudulent Transfer

Act ("TUFTA") recognizes that "evidence of actual fraud is often scarce and provides a

non-exhaustive list of badges of fraud that courts consider in determining whether a

debtor actually intended to defraud creditors under TUFTA."   Id. at 568 (internal

quotation marks and citations omitted).  The badges of fraud include

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property
> transferred after the transfer;
> (3) the transfer or obligation was concealed;
> (4) before the transfer was made or obligation was incurred,
> the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was
> reasonably equivalent to the value of the asset transferred or
> the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly
> after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a
> substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the
> business to a lienor who transferred the assets to an insider
> of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).  Thus, for the same reasons stated in subsection

III.B.3.a, supra, the Court concludes that CVMI has established the actual fraud prong

of TUFTA.  See TEX. BUS. ORG. CODE § 21.223(b).  Further, CVMI has established that

Cy and Lauren Hudson obtained a direct personal benefit from the May 10, 2018

conveyances based on the contractual language contained in the Guarantee

Agreement, which states that Cy and Lauren Hudson, as guarantors, "acknowledge and warrant that [they] derived or expect to derive financial and other advantage and benefit, directly or indirectly, from the issuance of the [promissory n]ote pursuant to the Redemption and Restructure, in an amount not less than the amount guaranteed [there]under."  Dkt. No. 76 at 11 (quoting Dkt. No. 69-19 at 3).  In addition, although framed in terms of Tex. Bus. Org. Code § 21.223 for the first time in its summary judgment reply papers, defendants will not suffer prejudice by granting summary judgment on this claim because CVMI referenced this same contractual language its motion for summary judgment and, therefore, defendants had sufficient notice of this aspect of CVMI's argument.  See Dkt. No. 69-2 at 20 (referencing the language in the Guarantee Agreement cited in support of its TUFTA claim, and arguing that Cy and Lauren Hudson "admitted that the transfer of assets and purchase of their father's shares was to benefit themselves personally for millions of dollars."); see Malay v. City of Syracuse, 638 F. Supp. 2d 303, 310 (N.D.N.Y. 2009) (explaining that "[t]he purpose of reply papers is to address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party," and holding that "because [the p]laintiff [wa]s not prejudice by the court's determination as to either newly raised argument, the Court will exercise its discretion to decide the same." (internal quotation marks and citation omitted)).  For the foregoing reasons, CVMI's motion for summary judgment is granted insofar as it seeks to pierce the corporate veil and hold Cy and Lauren Hudson liable for Hudson's contractual debts.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that CVMI's Motion for Summary Judgment, Dkt. No. 69, is **GRANTED in its entirety**, and it is further

**ORDERED**, that defendants' Motion for Summary Judgment, Dkt. No. 70, is **DENIED in its entirety**, and it is further

**ORDERED**, that CVMI's Cross Motion, Dkt. No. 74, is **DENIED in part** insofar as it seeks summary judgment on defendants' counterclaims for breach of contract based on delivery of defective grips and barrels and the parties' pay to ship agreement because genuine issues of material fact exist, which preclude summary judgment on those claims, and it is further

**ORDERED**, that CVMI's Cross Motion is **GRANTED in part** and the following of defendants' counterclaims are dismissed:

a) Repudiation;

b) Untimely and Imbalanced Delivery; and

c) Detrimental Reliance.

**IT IS SO ORDERED.**

Dated: July 2, 2020
        Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge